UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| **LYNN LUMBARD**, individually and on behalf of all others similarly situated, | |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| vs. | |
| **THE CITY OF ANN ARBOR**, | Case No. 2:22-cv-11426 |
| Defendant. | |

Plaintiff Lynn Lumbard on her own behalf and on behalf of all other persons similarly situated (hereinafter "Plaintiff"), in support of this Class Action Complaint against the City of Ann Arbor (hereinafter, the "City"), alleges as follows:

## PRELIMINARY STATEMENT

1. This is an action against the City of Ann Arbor pursuant to the Fifth and Fourteenth Amendments to the United States Constitution arising from the City's program of takings of private residential property at over 2,500 addresses in the City of Ann Arbor between 2000 and approximately 2013, including permanent components inside and outside by means of actual physical invasions and actual permanent physical appropriations and occupations under the City of Ann Arbor FDD Program ("FDD Program"), all as fully set forth in this Complaint.

1

2. The Ann Arbor City Council, in Ordinance No. 32-01 in 2001 (the "Ordinance") had mandated all such City construction, which it claimed was for a public purpose and not the private purposes of the homeowner.

3. The mandatory project at Plaintiff's home was preceded by entry onto the premises by employees, City officials and the City's outside contractors without warrant followed by demolition, excavation, and construction inside and outside Plaintiff's house and the actual and permanent removal of earth from the basement as debris in buckets.

4. The City left behind at Plaintiff's house permanent installations of operating hydraulic and electrical equipment, pipes, pumps, electrical wires, external drainage collectors, switches, attachment devices and other components.

5. The City's intent was openly destructive. The City and its contractors disabled the functioning systems for storm water drainage designed and built into the house in 1955, which was as required by the City Building Code and the building permit issued thereunder at the time.

6. The City alterations were extensive and altered the physical system and route for storm water drainage.

7. The City's official documents show that in 2001, before any mandatory alterations, the City knew that the mandatory alterations it had designed had no basis in science, engineering, plumbing or any relation to the

actual physical characteristics of Ann Arbor's municipal single-pipe combined sewer infrastructure.

8. The alterations eliminated gravity as the energy source for the drainage system; collected stormwater in a new sump inside the basement, rather than permitting it to drain downward to the "combined house sewer lead" below the foundation and outside the basement as required and permitted in 1955.

9. The City alterations redirected stormwater that previously flowed down by gravity into foundation drains for drainage below the house. Instead, the alterations required that the stormwater be pumped up from the sump in the basement floor to street level, by electricity, for discharge through the wall to a specially installed collection system near the street to a City catch basin, not to the municipal combined sewer collection system deep underground, as before.

10. The City's permanently attached installations occupy significant areas of Plaintiff's house, inside and out.

11. The project at Plaintiff's house, and at all targeted houses, included permanent piercing of the building envelope at street level through which a discharge pipe was installed.

12. Exhibit "1" is a photograph of one part of the Plaintiff's basement occupied permanently by the City's mandatory installation of operating electrical equipment and power backup in her home. Plaintiff is responsible for recharging and replacing backup batteries needed during power outages.

3

13. The nature of the invasion and appropriation of Plaintiff's home was destructive and burdensome.

14. The installations were unscientific in design and purpose.

15. According to a letter from the Michigan Bureau of Construction Codes ("MBCC") on November 7, 2014, the MBCC had allowed the City's mandatory projects to go forward free of state construction codes or building codes of any kind.

16. This intentionally non-code construction deprived owners of the targeted houses of the basic protection of such codes, increasing the burden of such installations. No owner was advised of this by the City in advance or ever.

17. The City intentionally and permanently disabled the foundation drainage system at houses that had been constructed decades ago and appeared to be functioning as designed.

18. The City's replacement is a system in two basement rooms of unwanted operating equipment, inside and outside Plaintiffs' home that is burdensome, costly, unsafe, noisy, ugly, and requires labor for the operation and maintenance required expressly in the City's Ordinance.

19. The mandatory entry, alterations, demolition, and permanent installations were performed against the will of the Plaintiff or based on a forced consent.

20. The City enforced its requirements for invasion and occupation

inside and outside her home by threatening financial penalties, followed by disconnection from **all** City and water and sewer services, and sewer liens for non-payment of fines and foreclosure actions by the City.

21. The Plaintiff herein seeks an award of just compensation for the permanent physical occupations of her house by the City, after physical invasion as herein set forth, and any necessary injunctive relief to end such permanent occupations.

22. The taking at the Plaintiff's house is of a continuing nature.

23. The taking at the Plaintiff's house has not stabilized.

24. The Plaintiff is entitled to the procedural protections for plaintiffs alleging permanent physical occupations of real property set forth in *Loretto v. Teleprompter Manhattan CATV*, 458 U.S. 519 (1982).

25. Such protections include an initial separate hearing on the existence of a permanent physical occupation, as alleged, to the exclusion of evidence of any purported public purpose, solely to determine whether a permanent physical occupation by appropriation of real estate exists.

26. The City's installation greatly exceeds the area of, and the one-eighth cubic foot in volume occupied by a thin cable wire physically attached to the outside of an apartment building the *Loretto* decision made intolerable, without any *de minimis* standard to be applied.

## THE PARTIES

27. Plaintiff, Lynn Lumbard, resides, and at all times hereinafter mentioned, resided at 1515 Avondale Avenue, Ann Arbor, MI 48103 in a home constructed in 1955. During all times relevant hereto, Plaintiff Lynn Lumbard has been the fee simple owner of the home.

28. The City is a municipal corporation, organized and existing under the laws of the State of Michigan, with an office for the transaction of business located at Larcom City Hall, 301 East Huron Street, Ann Arbor, Michigan 48104.

## JURISDICTION AND VENUE

29. This court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1331.

## RIPENESS OF FEDERAL TAKING CLAIMS

30. The Plaintiff's takings claims are ripe after the decision of the United States Supreme Court on June 21, 2019 in *Knick v Township of Scott*, 588 U.S. ___, 139 S. Ct. 2162; 204 L. Ed. 2d 558 (2019).

31. Plaintiff previously asserted her federal takings claims in this court before the decision in *Knick. Lumbard v City of Ann Arbor*, No. 2:17-cv-13428 (February 17, 2018). She had fulfilled the state litigation requirement under *Williamson County Regulatory Planning Commission v. Hamilton Bank*, 473 U.S. 172 (1985), but had been precluded under *San Remo Hotel v City and County of San Fransisco, San Remo Hotel L.P. v. San Francisco City & County*, 364 F.3d 1088 (9th Cir. 2004) (2005).

6

32. This court dismissed those claims as unripe under *Williamson* and precluded by *San Remo*.

33. The dismissal by this court was affirmed by the Sixth Circuit United States Court of Appeals on January 10, 2019, also relying on *Williamson* and *San Remo*. *Lumbard v. City of Ann*, 913 F.3d 585 (6th Cir. 2019) ("*Lumbard I*").

34. When the Sixth Circuit made its ruling in *Lumbard I*, *Knick* was pending decision in the United States Supreme Court.

35. *Knick* was decided on June 21, 2019, and in a landmark decision overturned both *Williamson* and *San Remo*.

36. *Knick* overruled the Sixth Circuit decision in *Lumbard I* by operation of law. The Supreme Court referred to the combined effects on federal takings plaintiffs of Williamson and San Remo as "the San Remo Trap."

37. For the avoidance of any doubt, in *Ostipow v. Federspiel,* No. 18-2448 (6th Cir. Aug. 18, 2020), the Sixth Circuit specifically acknowledged the result in *Lumbard I* as an example of the "plague" of *Williamson* and the effects on plaintiffs of requiring the completion of "burdensome" inverse condemnation proceedings, which Plaintiff and the Takings Class were required to complete and did complete in the Michigan state courts over the course of more than three years.

38. The Plaintiff's claims based on the actual invasion and actual permanent physical occupation by appropriation in and around her home are

therefore ripe for federal court adjudication.

39. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(c).

## FACTS COMMON TO ALL COUNTS

A. **Grandfathering Under City Ordinance 8-73**

40. The Plaintiff's house was built in 1955 in the Southwest quadrant of the City in an area including low elevations relative to other parts of Ann Arbor.

41. In October 1973, the Ann Arbor City Council enacted Ann Arbor Ordinance 8-73.

42. Ordinance 8-73 grandfathered the Plaintiff's house and all other houses in Ann Arbor built before 1974 from any later requirements for any changes in their stormwater drainage systems and use thereof, including drainage into and from their existing foundation drains to the City's combined sewer system located in the street.

43. The Plaintiff, therefore, and all other owners of pre-1974 homes were intended to be protected against any future actions by the City or the Council purporting to require them to make any changes in foundation drain systems without just compensation.

B. **The Invasion and Permanent Physical Occupation of the Plaintiff's Home by the City or its Agents Is Extensive**

44. The City designed specifications for its mandatory projects in 2000, which it used for the mandatory work at targeted houses.

45. Those documents and others about the City's construction steps have consistently included the open occupation and destruction of residential real property.

46. These documents describe the following other actions by the City and its handpicked contractors:

1. For construction in concrete basement locations (as in the case of Plaintiff Lumbard and a great majority of cases), the first step was jackhammering through the original concrete foundation floor followed by excavation of a sump pit approximately 36 inches in diameter and 42 inches deep;

2. For installation (as in relatively few cases) in a crawlspace location, the first step is digging up undisturbed flooring material and excavation of a sump pit there approximately 36 inches in diameter and approximately 42 inches deep;

3. In all cases, permanent construction within each sump pit of a sump crock approximately 18 to 24 inches in diameter;

4. Installation of pipes for the redirection of stormwater flows into the sump crock, which flows had (before the mandatory construction) drained into the existing house combined sewer lateral below the basement by gravity;

5. Penetration of the building envelope near street level through which a 4-inch sump pump discharge pipe was installed;

6. Installation of an electrical sump pump in the sump crock for the purpose of elevating and discharging water collected in the sump crock, through the installed vertical and horizontal piping and including through the aforesaid penetration of the building envelope, to the exterior of the house; and

7. Horizontal drilling of an external drainage system for discharges from the sump pump, including a shallow

       drainage line below ground and across the owner's property for conveyance of such discharges from the exterior wall of the house across the property to a catch basin in the street.

47. The owners of more than 2,500 homes in the City of Ann Arbor were required to submit to such construction on their private property and inside their residences pursuant to the City's program.

48. The Ordinance also includes an ongoing requirement for perpetual "corvée" labor for the City from each house for its installations and equipment (that is, labor per household for public works) under threat of legal process, without pay, to wit, continual monitoring, operation, repair, maintenance, basement flood control, and replacement of all or part of the installed machinery at her own expense each time it wears out.

49. The City has had detailed records which identify all homes within Ann Arbor that have been subjected to the described mandatory work.

50. Plaintiff's home and all other homes where mandatory construction was required were physically invaded and remain permanently and physically occupied by the City, an unwanted perpetual and troublesome tenant that causes basement flooding, to the extent of at least the construction, materials, pumps and other equipment, piping, wiring, fastening devices and other items permanently erected in, onto and around their private homes.

51. As a result of the work performed by the City or its agents, most of the affected homes now endure a stream of stormwater and groundwater that has

been rerouted from their pre-existing, lawful, external drainage to a stream of stormwater and groundwater drainage into the interior of the homes, which now flows into sump crocks in the foundation floors on a regularbasis.

52.     Whereas these owners, before the mandatory construction, could rely on gravity for storm water and ground water drainage, they have been required since then to rely upon electrical pumps for elevation and discharge of such drainage and, therefore, are dependent upon an uninterrupted electrical supply and are exposed to the attendant and constant risks of spring and/or winter flooding of the interiors of their homes during the daytime and nighttime alike.

**C.     Owners Were Coerced into Compliance with the City Program**

53.     The alterations, demolition, installations intended by the City were not and never intended to be voluntary.

54.     For example, in the City's "Homeowner Information Packet" (v8.4 8/8/2013) distributed to all targeted homeowners, the City included the following item in the "Frequently Asked Questions" in relevant part:

> *Legal Requirements*
>
> [Question:] May I choose not to participate in the program? What are the consequences of that?
>
> [Answer:] *Participation in this program is mandated by city ordinance.* … If the homeowner does not comply with the notices to arrange disconnection, a surcharge of $100 per month will be charged to the homeowner.

[Emphasis added.]

## CLASS ACTION ALLEGATIONS

55. Plaintiffs move this Court to enter an order certifying this cause as a Class Action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

56. Plaintiff Lynn Lumbard brings this class action on behalf of herself and the following class of similarly situated persons: all homeowners within the City of Ann Arbor whose one-family and two-family homes were permitted before January 15, 1974 and were subjected to mandatory foundation drain alterations pursuant to the Ordinance ("the Takings Class").

### Certification under Rule 23.

57. This action satisfies the numerosity, commonality, typicality and adequacy requirements of Fed. R. Civ. P. 23(a) and the requirements of Fed. R. Civ. P. 23(b)(3) militate in favor of a class certification in this case.

58. **Numerosity of the Takings Class**. The Takings Class satisfies the numerosity standards. The Class is believed to exceed 4,000 persons ("Members") in Washtenaw County, Michigan. Joinder of all Takings Class Members in a single action is impracticable and unwieldy. Takings Class Members may be kept informed of the status of the matter and important developments by published and broadcast notice, through direct mail and/or through the use of a password accessible website.

59. **Existence of Common Questions of Law and Fact:** There are

12

questions of fact and law common to the Takings Class which predominate over any questions affecting individual members. The questions of law and fact common to the Class arising out of the City's actions include, but are not limited to, the following:

(a) As its initial determination, whether the City's mandatory construction, demolition and installations (referred by the City as ("FDD construction") constitute *per se* physical takings by permanent physical occupations under *Loretto v. Teleprompter Manhattan CATV*, 459 U.S. 419 (1982);

(b) Whether the City was prohibited from implementing an ordinance that impaired or destroyed the Members' vested property rights under Ordinance 8-73;

(c) Whether FDD construction projects are continuing takings;

(d) Whether the results of FDD construction have stabilized as takings or can ever stabilize;

(e) Whether the City should be required to permit Class Members to restore the previous direction of flow of stormwater from their foundation drains to the City's combined sewer system and to remove the sump pits, sump pumps and other equipment permanently installed by the City or its agents in the Class Members' homes; and

(f) Whether the FDD construction at Takings Class Members houses are partial or complete takings.

60. **Predominance and Superiority.** The questions set forth above predominate over any questions affecting only individual persons and a Class Action is superior with respect to considerations of judicial economy, efficiency, fairness, and equity, to other available methods for the fair and efficient

adjudication of this controversy.

61.     **Typicality.** The claims of the class representative are typical of the claims of the Takings Class members in that FDD contruction at their homes were all undertaken pursuant to the Ordinance and the policies and procedures employed by the City and its authorized agents to implement the Ordinance and most of the after-effects of FDD construction city-wide are shown in the class representative's house and property.

62.     **Adequacy.** The class representative will fairly and adequately represent  the class.  Plaintiff Lynn Lumbard is an adequate representative of the Takings Class because she is a member of the proposed Takings Class and her interests do not conflict with the interests of the members of the Class they seek to represent. Plaintiff Lumbard has been litigating the legality of the FDDP since as early as 2016, beginning in state courts under *Williamson*, *supra*. The interests of the members of the Takings Class will be fairly and adequately protected by the Plaintiff and her counsel, who has extensive experience prosecuting litigation against the City over the City's FDD program, in particular. Counsel for the Plaintiff also has investigated the FDD program for over 10 years, including depositions of City officials and employees involved in this case, and has extensive background materials concerning the Ann Arbor FDD program.

63.     **Predominance and Superiority.** A class action is, by far, the most appropriate method for the fair and efficient adjudication of this controversy. The

City has not acknowledged that the FDD program results in any physical invasion or occupation or otherwise results in a taking. The presentation of separate actions could create a risk of inconsistent and varying determinations on the merits, establish incompatible standards of conduct for the City and/or make it more difficult for the Takings Class Members to vindicate their rights.

64.   Maintenance of this action as a class action is a fair and efficient method for the adjudication of this controversy. It would be impracticable and undesirable for each member of the Takings Class who suffered harm to bring a separate action. In addition, the maintenance of separate actions would place an undue burden on the courts and run the risk of inconsistent determinations.

## THE PLAINTIFF'S CLAIMS

65.   Because the Plaintiff's home and the homes of all Takings Class Members were completed by 1973, Ordinance 8-73 grandfathered all such homes from the City's program of mandatory construction at their homes. The City should never have disturbed them in any way for such purposes.

66.   The forced installation of sump crocks, sump pumps, pipes, wiring, electrical connections, external drainage lines and related equipment constituted an actual physical invasion by the City, or others acting on its behalf or in its stead, leaving behind a permanent physical occupation of the Plaintiff's property by actual appropriation, ousting the Plaintiff and the owners of over 2,500 targeted homes from their exclusive use and occupation of their primary

15

residences.

67. Moreover, the mandatory ongoing and perpetual responsibilities imposed on present and future owners for the observation, inspection, operation, repair and maintenance of the pumps and related equipment represent an unreasonable financial and personal burden upon the Plaintiff's use and enjoyment of their property and are an unrecorded legal burden running with the land, for which just compensation must be paid after due process.

68. The City has authority under the Ordinance to enforce such requirements for labor.

69. The physical invasion and occupation of the Plaintiff's properties deprive them of the incidents of ownership as they have lost the full bundle of rights that accompany ownership of real property, including, but not limited to, the ability to control the property and what is placed in and upon it and the right to exclude others from occupation of it.

## FIRST CAUSE OF ACTION
### *FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION*

70. Plaintiffs repeat and re-allege Paragraphs "1" through "68", as if more fully set forth herein.

71. The Fifth Amendment to the United States Constitution provides, in pertinent part, that private property shall not be taken for public use without due

process and just compensation.

72. The City's implementation and enforcement of the Ordinance has directly and particularly resulted in the Loretto-type taking of the Plaintiff's residential property without due process or just compensation.

73. As a result of the foregoing, the Plaintiff and the other Takings Class Members are entitled to due process and just compensation.

## SECOND CAUSE OF ACTION
### *CITY OF ANN ARBOR ORDINANCE 8-73*

74. Plaintiffs repeat and re-allege Paragraphs "1" through "72," as if more fully set forth herein.

75. Ordinance 8-73, as aforesaid, absolutely protected the vested property rights of the Plaintiff and the other Takings Class Members from any invasions and occupations of their homes under the FDD program.

76. Despite the grandfathering of these vested rights, and the Plaintiff's right under Ordinance 8-73 to be left alone, the City's implementation of the FDD program in their homes constituted a full taking of such property rights.

77. As a result of the foregoing, the Plaintiff and the other Takings Class Members are entitled to due process and just compensation.

## THIRD CAUSE OF ACTION
### *42 U.S.C. SECTION 1983*

78. Plaintiffs repeat and reallege Paragraphs "1" through "76" as if more

fully set forth herein.

79. The City is a "person" subject to liability under 42 U.S.C. Section 1983 for violating the federally protected fundamental rights of others.

80. The implementation and enforcement of the Ordinance by the City of Ann Arbor, particularly and directly against the homes of Plaintiff and the members of the Takings Class, has resulted in the violation of their federally protected rights, to wit, their right to exclude the City from their homes for such purposes and not to have their primary residences taken without just compensation or due process.

81. The implementation and enforcement of the Ordinance by the City constitutes per se takings of the Plaintiff's properties by actual physical invasion and actual permanent physical appropriation and occupation without due process or just compensation.

82. As a result of the foregoing, the Plaintiffs and the other Takings Class Members are entitled to due process and just compensation.

## FOURTH CAUSE OF ACTION
### *INJUNCTIVE RELIEF*

83. Plaintiff repeats and re-alleges Paragraphs "1" through "81" as more fully set forth herein.

84. The Plaintiff and the other Class Members have no adequate remedy at law.

85. In the absence of injunctive relief in conjunction with an award of just compensation, the Plaintiffs and the other Class Members will continue to endure the actual physical invasions and actual permanent physical occupation of their property by appropriation.

86. In conjunction with an award of just compensation, the Plaintiffs and other Class Members are entitled to injunctive relief, requiring the City to permit Class Members to reverse, correct and remedy the effects of the unconstitutional taking of their residential property as alleged herein.

## FIFTH CAUSE OF ACTION
### *ATTORNEYS FEES*

87. Plaintiffs repeat and re-allege paragraphs "1" through "85" as if fully set forth herein.

88. As a result of the facts and circumstances of this matter, the Plaintiffs and other Class members are entitled to reasonable attorneys' fees as allowed by law.

**WHEREFORE**, the Plaintiff respectfully requests judgment as follows:

A. Certification of the proposed Class under the Federal Rules of Civil Procedure;

B. On her first cause of action, a determination that the City demolition, installation, permanent attachment and other actions alleged herein is a permanent physical occupation by actual invasion and appropriation of Plaintiff's residential real estate, and due process and just compensation for such *per se* taking;

C. On her second cause of action, due process and just compensation as required by the Fifth Amendment to the United States Constitution for the total taking by the City of Plaintiff's vested property rights under Ordinance 8-73; including the payment of back rent and future rent for space the City continues to occupy by the City's installations;

D. On her third cause of action, preliminary and permanent injunctive relief permitting Plaintiff and the other Takings Class Members to reverse and remedy the effects of the unconstitutional takings at their residences, and granting such other injunctive relief as to the Court may seem just and proper;

E. On her fourth cause of action, reasonable attorneys' fees as allowed by law;

F. Such other and further relief as the Court may deem just and proper; and

G. The costs and disbursements of this action.

Dated: June 24, 2022         By: IRVIN A. MERMELSTEIN

s/Irvin Mermelstein

_____
Attorney for Plaintiff
2099 Ascot Road
Ann Arbor, MI 48103
(734) 717-0383
nrglaw@gmail.com
P52053